T.C. Memo. 1996-421

UNITED STATES TAX COURT

JOE M. AND PATRICIA M. BROWN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9129-93.                  Filed September 18, 1996.

<u>Robert O. Kazary</u>, for petitioners.

<u>Alan R. Peregoy</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

DAWSON, <u>Judge</u>:  This case was assigned to Special Trial
Judge Robert N. Armen, Jr., pursuant to the provisions of section
7443A(b)(4) of the Internal Revenue Code of 1986, as amended, and

Rules 180, 181, and 183.[1]  The Court agrees with and adopts the Opinion of the Special Trial Judge, which is set forth below.

OPINION OF THE SPECIAL TRIAL JUDGE

ARMEN, Special Trial Judge:  Respondent determined the following deficiencies in petitioners' Federal income and excise taxes for the taxable years 1989 and 1990:

(1)  For the taxable year 1989, respondent determined a deficiency in petitioners' income tax, as well as deficiencies in petitioners' excise taxes under sections 4973 and 4980A,[2] in the total amount of $73,905.  The deficiency in income tax includes the 10-percent additional tax imposed by section 72(t) on early distributions from qualified retirement plans.[3]

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for 1989 and 1990, the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2] Sec. 4973 imposes a 6-percent excise tax on excess contributions to individual retirement accounts.  Sec. 4980A imposes a 15-percent excise tax on excess distributions from qualified retirement plans.  Both of these taxes are included within ch. 43 of the I.R.C.  They are therefore subject to the deficiency procedures set forth in subch. B of ch. 63 of the I.R.C.  See sec. 6211(a).

[3] The notice of deficiency is not a model of clarity.  However, the deficiencies determined therein for the taxable year 1989 are as follows:

Deficiency in income tax
(1) Regular income tax under sec. 1    $38,233
(2) Additional tax under sec. 72(t)      22,781      $61,014

Deficiencies in excise taxes
(1) Under sec. 4973                                    9,000
(2) Under sec. 4980A                                  3,891

(2)  For the taxable year 1990, respondent determined a deficiency in petitioners' income tax, as well as a deficiency in petitioners' excise tax under section 4980A, in the total amount of $15,669.  The 10-percent additional tax imposed by section 72(t) constitutes the deficiency in income tax.[4]

In her amended answer, respondent asserted deficiencies in petitioners' income tax and excise tax under section 4980A for the taxable year 1990 in the total amount of $19,394, an increase in the amount of $3,725 over the total determined in the notice of deficiency.[5]

---

Total deficiencies in income and excise taxes        73,905

[4] Again, the notice of deficiency is not a model of clarity. However, the deficiencies determined therein for the taxable year 1990 are as follows:

Deficiency in income tax
  -- under sec. 72(t)                                $15,446

Deficiency in excise tax
  -- under sec. 4980A                                    223

Total deficiencies in income and excise taxes        15,669

[5] The increase consists of the following:

| Income/excise tax | Deficiencies | | |
| | Statutory notice | Amended answer | Increase |
| Section 1 | --- | $3,302 | $3,302 |
| Section 72(t) | $15,446 | 15,728 | 282 |
| Section 4980A | 223 | 364 | 141 |
| | $15,669 | $19,394 | $3,725 |

After concessions by the parties,[6] the issues for decision are as follows:

(1) Whether the Transfer Refund distribution received by petitioner Joe M. Brown in 1989 from the Maryland State Employees' Retirement System qualifies as a partial distribution eligible for tax-free rollover treatment under section 402(a)(5);

(2) whether petitioners must include in their gross income for 1990, the amount distributed from petitioner's individual retirement account during that year;

(3) whether petitioners are liable for the 10-percent additional tax under section 72(t) for 1989 and 1990; and

(4) whether petitioner Joe M. Brown is liable for the 6-percent excise tax under section 4973 for 1989 and the 15-percent excise tax under 4980A for 1989 and 1990.[7]

Generally speaking, the resolution of the foregoing issues turns on whether petitioner Joe M. Brown was disabled, within the meaning of section 72(m)(7), immediately before receiving the

---

[6] For 1989, respondent concedes that the 6-percent excise tax imposed by sec. 4973 should be calculated based on an excess contribution of $148,000 rather than $150,000. Respondent also concedes that petitioner Patricia M. Brown is not liable for: (1) The excise taxes under secs. 4973 and 4980A for 1989, or (2) the excise tax under sec. 4980A for 1990.
For 1990, petitioners concede: (1) They failed to report interest income from the First National Bank of Maryland in the amount of $512, and (2) they are only entitled to a deduction for mortgage interest in the amount of $3,262, rather than in the amount of $5,480, as claimed on their return for that year.

[7] See supra note 6 regarding respondent's concessions of the excise taxes as to petitioner Patricia M. Brown.

Transfer Refund distribution from the Maryland State Employees' Retirement System in 1989.

FINDINGS OF FACT

Some of the facts have been stipulated, and they are so found. Petitioners resided in Oldtown, Maryland, at the time that their petition was filed with the Court.

General Background

Petitioner Joe M. Brown (petitioner) was born in 1937. He was hired by the Maryland State Highway Administration (Highway Administration) in 1956, and he worked for the Highway Administration until he retired, effective May 1, 1991.

For most of his career with the Highway Administration, petitioner was employed as an engineering technician. As an engineering technician, petitioner worked as a project engineer, responsible for the construction of highways and bridges. Petitioner's principal focus, at least during the latter stages of his career, was the construction of bridges.

A project engineer is the State's construction engineering representative who is directly in charge of a particular road-building or bridge-building project. The State considers a project engineer to be a key person of the team assigned to such a project.

The responsibilities of a project engineer include many duties that are supervisory in nature. For example, a project engineer must supervise the activities and performance of

personnel to ensure that delegated tasks are satisfactorily performed. Additionally, a project engineer must ensure that appropriate personnel are on duty at all required times and that they carry out their work assignments. A project engineer is also responsible for recordkeeping and report preparation.

Project engineers spend anywhere from 50 to 70 percent of their time working "on site". In order to perform their duties on site, the project engineer must be able to move freely about a construction site. Such mobility demands considerable walking and climbing (e.g., up and down ladders and hillsides, into and out of operating machinery and motor vehicles, on top of building supplies, and over various obstructions). In addition, "site work" requires the project engineer to lift heavy objects and to "walk beams", particularly when bridge construction is involved.

Petitioner was competent as a project engineer, having a good combination of professional skills and practical experience. Moreover, he enjoyed a good reputation as a hard-worker and a "can do" person. He was also dependable and always available to help others. Not surprisingly, petitioner was popular among his colleagues; he was equally respected and well-liked by both his superiors and his subordinates.

Petitioner received superior job evaluations on his annual efficiency rating reports for the calendar years 1989 and 1990.

Petitioner's Transfer Refund Distribution

For most of his employment career, petitioner was a member of the Maryland State Employees' Retirement System (the Retirement System). However, on October 6, 1989, petitioner elected to transfer to the Maryland State Employees' Pension System (the Pension System). Petitioner's election to transfer from the Retirement System to the Pension System was effective October 1, 1989.[8]

The Retirement System is a qualified defined benefit plan under section 401(a) that requires mandatory nondeductible employee contributions. The Pension System is also a qualified defined benefit plan under section 401(a), but generally does not require mandatory nondeductible employee contributions. The State of Maryland contributes to both the Retirement System and the Pension System on behalf of the members of those systems. The trusts maintained as part of the Retirement System and the Pension System are both exempt from taxation under section 501(a).

---

[8] For a discussion of the Retirement System and the Pension System, see generally Hylton v. Commissioner, T.C. Memo. 1995-27; Hoppe v. Commissioner, T.C. Memo. 1994-635; Hamilton v. Commissioner, T.C. Memo. 1994-633; Maryland State Teachers Association v. Hughes, 594 F. Supp. 1353, 1357-1358 (D. Md. 1984); Conway v. United States, 908 F. Supp. 292 (D. Md. 1995).

As previously indicated, petitioner elected to transfer from the Retirement System to the Pension System on October 6, 1989. On the application to transfer, petitioner specifically opted to receive, in a lump sum, the distribution to which he was entitled upon transferring from the Retirement System to the Pension System.

As a result of the election to transfer, petitioner received a distribution (the Transfer Refund) from the Retirement System in the amount of $244,151.04. Petitioner received the Transfer Refund in the form of a check dated October 31, 1989, from Maryland State Retirement Systems.

Petitioner's Transfer Refund consisted of $16,338.93 in previously taxed contributions made by petitioner during his employment tenure with the State, $1,005.11 of employer "pick-up contributions",[9] and $226,807 of earnings in the form of interest. The earnings and "pick-up contributions", which total $227,812.11, constitute the taxable portion of the Transfer Refund.

At the time that petitioner transferred from the Retirement System to the Pension System and received the Transfer Refund, he had attained the age of 52. If petitioner had not transferred to the Pension System but had remained a member of the Retirement System, he would have been entitled to retire and receive a

---

[9] See sec. 414(h)(2).

normal service retirement benefit, including a regular monthly annuity, under the Retirement System.  He would not have been entitled to receive a Transfer Refund, however, because a Transfer Refund is payable only as a consequence of transferring from the Retirement System to the Pension System.

Also as a consequence of transferring from the Retirement System to the Pension System, petitioner became a member of the Pension System.  As a member of the Pension System, petitioner became entitled (when he chose to retire) to receive a retirement benefit based upon his salary and his creditable years of service, specifically including those years of creditable service recognized under the Retirement System.[10]  However, because petitioner received the Transfer Refund on account of transferring from the Retirement System to the Pension System, the monthly annuity that petitioner would receive when he chose to retire from the Pension System was less than the monthly annuity that he would have received if he had not transferred to the Pension System but had retired under the Retirement System.

Rollover of Petitioner's Transfer Refund

In late October or early November 1989, immediately after receiving the Transfer Refund, petitioner rolled over $150,000

---

[10] Petitioner became a member of the Retirement System when he was hired by the Highway Administration in 1956.  He remained a member of the Retirement System for most of his employment career.

thereof into an IRA with First National Bank of Maryland (First National).

## Petitioner's IRA Distribution

Sometime after petitioner had effected the $150,000 rollover of his Transfer Refund, petitioner's former supervisor informed petitioner that the Transfer Refund might not qualify for tax-free rollover treatment. Accordingly, on or about August 8, 1990, petitioner withdrew $157,174 from his IRA with First National. At the time that petitioner received this distribution, he had not quite attained the age of 53.

## Petitioner's Health And His Employment

Petitioner has had a history of health problems. When he was about 1 year old, petitioner contracted polio and suffered severe atrophy of his right leg. As a consequence, petitioner has suffered severe degenerative joint disease of the spine and left knee.

The strain on petitioner's body, and in particular the strain on petitioner's right leg and spine, has been exacerbated by petitioner's obesity. His weight has exceeded 300 pounds for substantial periods of his life. In October 1989 his weight exceeded 290 pounds.

Petitioner developed severe lower back problems, which caused considerable pain, because of the polio-induced atrophy of his right leg. In 1977 petitioner was forced to undergo back surgery, and vertebrae in his spine were fused in order to manage

his pain. For some time thereafter, petitioner was temporarily paralyzed.

Petitioner also developed osteoarthritis, primarily in the lower back related to the fusion of vertebrae and in his knees. By mid-1987, moderate degenerative changes were apparent in petitioner's mid- and lower thoracic spine. By 1990 the degenerative changes were apparent throughout petitioner's spine.

In September 1978, Maryland State Retirement Systems granted petitioner a disability retirement allowance. However, after a discussion with his wife, petitioner decided not to accept any "freeloads". Petitioner struggled to rehabilitate himself, and he eventually returned to work as a project engineer with the Highway Administration.

In early 1987, petitioner's left knee "went out completely". Sometime thereafter, but before 1989, doctors replaced petitioner's left knee. However, within 9 months, the replacement knee "broke completely out of [the] bone". Petitioner had difficulty walking after the replacement knee broke. Accordingly, on August 3, 1990, doctors replaced petitioner's left knee for the second time. Petitioner needed to use crutches for 6 months following his second knee operation.

Petitioner has also had a clinically significant history of hypertension. This condition has occasioned the postponement of scheduled surgery on two occasions.

At various times and for extended periods, petitioner has experienced pain severe enough to warrant prescription-strength analgesics. Such analgesics have not always been effective to manage petitioner's pain.

Petitioner's medical condition justified the issuance of handicapped tags and permit by the Maryland department of motor vehicles. However, by no later than February 1991, petitioner's ability even to drive a motor vehicle was very limited.

Notwithstanding petitioner's physical impairment as of October 1989, petitioner retained his position as project engineer and remained "on the job" until December 1990, at which time he went on leave, never to return to work. During this period, petitioner struggled to perform his job. Although he could no longer climb or "walk beams", he attempted to "control his job" by telephone from home and he attempted to work "on site" by driving along, or by being driven along, in a vehicle.

During 1989, petitioner earned 120 hours of sick leave but did not use any amount thereof. During 1990, petitioner also earned 120 hours of sick leave but did not use any amount thereof. However, it was not unusual for petitioner to use annual leave (vacation days) in lieu of sick leave. Thus, for example, petitioner used annual leave for his knee replacement surgery on August 3, 1990, and for the two-week period thereafter while he convalesced. Petitioner used all of his 200 hours of

annual leave in 1990. In 1989, he used 84 hours of annual leave, mostly in the final two months of the year.

## Events Leading to Petitioner's Retirement

On December 26, 1990, petitioner went on leave and never returned to work. Petitioner exhausted his accumulated annual and sick leave before his retirement. Petitioner chose to exhaust his leave before retiring because it was both permitted and financially advantageous to do so.

On February 14, 1991, petitioner authorized his physician to submit a medical statement of disability to the Medical Board of the State of Maryland (the Medical Board). Petitioner also submitted a handwritten statement at that time, which statement concluded as follows:

> As when the State of Maryland gave a handi-cap boy
> a wonderful job in 1956, in 1977 I said I was not ready
> to give up.
> But in 1991, I don't think I have no other choice.

On March 21, 1991, the Medical Board recommended that petitioner be approved for ordinary disability retirement. The Medical Board's report stated as follows:

> It is the recommendation of the Medical Board that
> [petitioner] be approved ordinary disability due to
> osteoarthritis of the spine, hypertensive
> cardiovascular disease, old polio with atrophy of the
> right leg and obesity.

## Petitioner's Retirement

Even though petitioner was approved for an ordinary disability retirement, he ultimately decided to apply for a

normal service retirement.  In view of the fact that petitioner had worked for the Highway Administration for over 35 years and had previously received a Transfer Refund, retirement on a "normal" basis, rather than on a disability basis, was more advantageous.  Accordingly, on April 22, 1991, petitioner applied to the Pension System for a normal service retirement, effective May 1, 1991.  Petitioner's application for retirement was approved, and petitioner retired from the Highway Administration on May 1, 1991.

As a result of his retirement, petitioner is receiving a normal service retirement benefit from the Pension System based upon his salary and his creditable years of service, specifically including those years of creditable service recognized under the Retirement System.  However, as previously indicated, because petitioner received the Transfer Refund on account of transferring from the Retirement System to the Pension System, petitioner's monthly annuity is less than the monthly annuity that he would have received if he had not transferred to the Pension System but had retired under the Retirement System.

On November 19, 1991, the Social Security Administration (SSA) notified petitioner that he was entitled to disability benefits because of SSA's determination that petitioner had become disabled on December 22, 1990.

Petitioners' 1989 Income Tax Return

On their income tax return for 1989, petitioners disclosed the receipt of the taxable portion of the Transfer Refund; i.e., $227,812. Of this amount, petitioners reported that $77,812 was taxable and that the balance, or $150,000, had been rolled over tax-free into an IRA.

Petitioners attached Form 5329 "Return for Additional Taxes Attributable to Qualified Retirement Plans (Including IRAs) Annuities, and Modified Endowment Contracts" to their 1989 return. In Part II of this form, petitioners reported liability in the amount of $7,781 for the additional tax under section 72(t); i.e., 10 percent of $77,812, the amount of the Transfer Refund that petitioners had included in gross income.

Respondent's Deficiency Determination For 1989

In the notice of deficiency for 1989, respondent determined that petitioner's Transfer Refund was not eligible for tax-free rollover treatment under section 402(a)(5). Respondent also determined that, by virtue of sections 402(a)(1) and 72, the taxable portion of the Transfer Refund (i.e., $227,812.11) was includable in petitioners' gross income for 1989. Accordingly, because petitioners had previously reported that $77,812 of such amount was taxable and had attempted to roll over only the balance (i.e., $150,000), respondent increased petitioners'

taxable income by $150,000.[11]  As corollaries to this determination, respondent also determined that petitioners are liable for: (1) The additional tax under section 72(t) for a premature distribution from the Retirement System; (2) the excise tax under section 4980A for an excess distribution from the Retirement System; and (3) the excise tax under section 4973 for an excess contribution to petitioner's IRA with First National.[12]

Petitioners' 1990 Income Tax Return

On their income tax return for 1990, petitioners reported taxable interest in the total amount of $154,613.  Of this amount, $150,000 represented a distribution from petitioner's IRA with First National, which petitioners characterized as an early withdrawal.  The balance represented interest income from unrelated bank accounts.

---

[11] The notice of deficiency, which was issued by respondent's Appeals Office in Baltimore, Maryland, states as follows:

> Your gross income has been increased to include the amount of $150,000 you received as payment from your qualified retirement plan because you received the payment before you reached aged [sic] 59 1/2 or became disabled.  Accordingly, taxable income is increased $150,000.

Respondent repeatedly cross-referenced the foregoing paragraph by way of explanation for most of the other adjustments made in the notice of deficiency.

[12] See supra note 6 regarding respondent's concession of the excise taxes as to petitioner Patricia M. Brown.

Respondent's Deficiency Determination For 1990

In the notice of deficiency for 1990, respondent determined that petitioners are liable for: (1) The additional tax under section 72(t) for a premature distribution from petitioner's IRA with First National, and (2) the excise tax under section 4980A for an excess distribution from such IRA.[13]

Respondent's Claim For An Increased Deficiency For 1990

In her amended answer, respondent asserted deficiencies in petitioners' income tax and excise tax under section 4980A for the taxable year 1990 in the total amount of $19,394, an increase of $3,725 over the total determined in the notice of deficiency.[14] The increase is principally attributable to the fact that petitioner withdrew $157,174 from his IRA with First National in 1990 but only reported $150,000 thereof on his 1990 income tax return. Correlative adjustments were asserted regarding the additional tax under section 72(t) and the excise tax under section 4980A.[15]

---

[13] See *supra* note 6 regarding respondent's concession of the excise tax as to petitioner Patricia M. Brown.

[14] See *supra* note 5 for a breakdown of the increase by the type of tax involved.

[15] Other adjustments asserted by respondent that served to increase petitioners' income tax include: (1) The understatement of interest income in the amount of $512, (2) the overstatement of a deduction for mortgage interest in the amount of $2,218, and (3) the understatement of additional income from Maryland State

Petitioner's Physical Condition At Trial

Petitioner's physical condition at the time of trial was essentially the same as petitioner's physical condition immediately before receiving the Transfer Refund in October 1989.

At trial, petitioner was unable to stand with reasonable effort and was unable to assume the witness stand without risk of safety to himself. The evidence of significant physical pain was apparent from petitioner's demeanor.

ULTIMATE FINDING OF FACT

Petitioner was disabled within the meaning of section 72(m)(7) immediately before receiving the Transfer Refund in October 1989.

OPINION

I. Rollover Issue

We must first decide whether the Transfer Refund received by petitioner in 1989 from the Retirement System qualifies for tax-free rollover treatment under section 402(a)(5). The resolution

Retirement Systems in the amount of $103. Petitioners have conceded the first two adjustments. See supra note 6. However, respondent did not offer any evidence at trial regarding the third adjustment and therefore did not carry her burden of proof in respect of that adjustment or the correlative adjustments under secs. 72(t), 4980A. Accordingly, petitioners are not liable for any increase in tax (whether under secs. 1, 72(t), or 4980A) attributable to the $103 adjustment related to additional income from Maryland State Retirement Systems.

of this issue turns on whether the Transfer Refund constitutes a "partial distribution", as defined by section 402(a)(5)(E)(v).[16]

A "partial distribution" is defined as "any distribution to an employee of all or any portion of the balance to the credit of such employee in a qualified trust; except that such term shall not include any distribution which is a qualified total distribution."  Sec. 402(a)(5)(E)(v).  Further, a partial distribution must be "payable as provided in clause (i), (iii), or (iv) of subsection (e)(4)(A) (without regard to the second sentence thereof)".  Sec. 402(a)(5)(D)(i)(I).[17]

As relevant herein, section 402(e)(4)(A) provides that a distribution must be made either "(i) on account of the

---

[16] The Transfer Refund would also qualify for tax-free rollover treatment if it were a "qualified total distribution", as defined by sec. 402(a)(5)(E)(i).  In this case, petitioners do not contend that the Transfer Refund was a qualified total distribution.  In any event, the Transfer Refund was not a qualified total distribution.  See Wittstadt v. Commissioner, T.C. Memo. 1995-492, Humberson v. Commissioner, T.C. Memo. 1995-470; Pumphrey v. Commissioner, T.C. Memo 1995-469; Dorsey v. Commissioner, T.C. Memo. 1995-97, affd. without published opinion 91 F.3d 129 (4th Cir. 1996); Hylton v. Commissioner, T.C. Memo. 1995-27.

[17] In order to qualify as a "partial distribution", sec. 402(a)(5)(D)(i)(I) also requires that the distribution "is of an amount equal to at least 50 percent of the balance to the credit of the employee in a qualified trust".  This additional requirement was not raised in the notice of deficiency as a reason for the adjustment to petitioners' income for 1989, see supra note 11, nor was it raised by respondent in either her trial memorandum or at trial in her counsel's opening statement.

employee's death", "(iii) on account of the employee's separation from the service", or "(iv) after the employee has become disabled (within the meaning of section 72(m)(7))".  Petitioners do not contend that the Transfer Refund was received either on account of petitioner's death or on account of petitioner's separation from service.[18]  Rather, petitioners contend that the Transfer Refund was received "after * * * [petitioner had] become disabled (within the meaning of section 72(m)(7))" under section 402(e)(4)(A)(iv).  Respondent contends to the contrary.[19]

Our analysis necessarily begins with section 72(m)(7).  That section is explicit as to the meaning of the term "disabled".  Under section 72(m)(7), an individual is considered disabled if he is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of a

---

[18] In other cases we have held that a Transfer Refund is not received on account of a taxpayer's separation from the service but rather on account of a taxpayer's election to transfer from the Retirement System to the Pension System.  E.g., Dorsey v. Commissioner, supra; Hylton v. Commissioner, T.C. Memo. 1995-27.  But see Adler v. Commissioner, 86 F.3d 378 (4th Cir. 1996), revg. and remanding T.C. Memo. 1995-148.

[19] As previously noted, respondent has limited her contention regarding whether the Transfer Refund constitutes a partial distribution to the issue of petitioner's disability.  See supra note 17.  Accordingly, we consider such issue to be dispositive of whether the Transfer Refund constitutes a partial distribution.

long-continued and indefinite duration."  See <u>Dwyer v.
Commissioner</u>, 106 T.C. 337 (1996).  The regulations provide that
the determination is to be made on the basis of all the facts.
See sec. 1.72-17A(f)(2), Income Tax Regs.  The regulations also
set forth general considerations upon which a determination of
disability is to be made.  See sec. 1.72-17A(f), Income Tax Regs.

In determining whether an individual's infirmity makes the
individual unable to engage in any substantial gainful activity,
primary consideration is to be given to the nature and severity
of the impairment.  Sec. 1.72-17A(f)(1), Income Tax Regs.
However, the regulations emphasize that the "substantial gainful
activity" to which section 72(m)(7) refers is the activity, or a
comparable activity, in which the individual customarily engaged
prior to the impairment.  Sec. 1.72-17A(f)(2), Income Tax Regs.
Therefore, the impairment must be evaluated in terms of whether
it does, in fact, prevent the individual from engaging in his
customary, or any comparable, substantial gainful activity.  <u>Id</u>.
More specifically, the regulations provide that an individual
will not be deemed disabled if "with reasonable effort and safety
to himself, the impairment can be diminished to the extent that
the individual will not be prevented by the impairment from
engaging in his customary or any comparable substantial gainful
activity".  Sec. 1.72-17A(f)(4), Income Tax Regs.

Although we think that the issue is very close, we hold that petitioners have carried their burden of proof.

In advocating her position, respondent relies heavily on the fact that petitioner did not use any sick leave in either 1989 or 1990. However, it was not unusual for petitioner to use annual leave in lieu of sick leave, as evidenced by the fact that petitioner used annual leave for his knee replacement surgery in August 1990 and for the convalescent period thereafter. We also note that petitioner used all of his annual leave in 1990, as well as a substantial portion thereof in 1989, mostly in the final 2 months of that year.

Respondent also relies heavily on the fact that petitioner remained "on the job" until December 1990, at which time he went on leave, never to return to work. In a related vein, respondent points to the superior job evaluations that petitioner received for 1989 and 1990.

We observe, however, that petitioner did not receive his Transfer Refund until late October 1989, almost 10 months into the rating period for 1989. Accordingly, a superior job evaluation for 1989 is not incompatible with the fact of disability immediately before the receipt of the Transfer Refund.

Petitioner's job evaluation for 1990 is another matter, and we can appreciate why respondent focuses on it. However, we are

reminded that petitioner's position as a project engineer required that he be substantially mobile and physically fit in order to perform his duties. Further, the record clearly demonstrates that as of October 1989, petitioner was unable to climb ladders or otherwise, lift heavy objects, or "walk beams". In short, based on the particular facts and circumstances of this case, we find the content of the job evaluation report for 1990 to be contrary to the weight of the evidence. Moreover, the record demonstrates that when petitioner's disability became such that petitioner could no longer perform his job but he was mentally not ready to give up, his subordinates and superiors accommodated him however they could.

As reflected in our findings of fact, petitioner's physical condition at the time of trial was essentially the same as it was immediately before receiving the Transfer Refund in October 1989. In our judgment, and based on our observations over the course of an afternoon, petitioner was disabled at the time of trial. Thus, suffice it to say that petitioner was neither mobile nor fit immediately before receiving the Transfer Refund in October 1989. His physical impairment, which was of a long-continued and indefinite duration, precluded him from engaging in his customary or any comparable substantial gainful activity.

In view of the foregoing, we hold that petitioner was disabled, within the meaning of section 72(m)(7), immediately before receiving the Transfer Refund. Accordingly, the Transfer Refund qualifies as a partial distribution and is eligible for tax-free rollover treatment under section 402(a)(5)(D). Petitioners are therefore not required to include in their gross income for 1989 the $150,000 that was not previously included therein.

## II. The IRA Distribution Issue

On or about August 8, 1990, petitioner withdrew $157,174 from his IRA with First National. Petitioners reported $150,000 of this distribution in their gross income for 1990.

Respondent contends that for 1990, petitioners failed to include in their gross income $7,174 of petitioner's IRA distribution from First National. We do not understand petitioners to argue that the amount of the IRA distribution in excess of $150,000; i.e., $7,174, is not includable in their gross income for 1990. In any event, based on the record as a whole, we are satisfied that the $7,174 represents taxable earnings from petitioner's IRA and that such amount is properly includable in petitioners' gross income for 1990. Sec. 408(d)(1).

In view of our conclusion, _supra_, that petitioner's Transfer Refund qualifies for tax-free rollover treatment in 1989 under section 402(a)(5)(D), we understand petitioners to abandon what must be viewed as their alternative contentions concerning the alleged excludibility of $150,000 of petitioner's IRA distribution from gross income for 1990. In any event, such amount is properly includable in petitioners' gross income for that year. Sec. 408(d)(1).

III. Section 72(t) Additional Tax Issue

We turn next to respondent's determination that petitioners are liable for the additional tax under section 72(t) for 1989 and 1990.

Section 72(t) provides for a 10-percent additional tax on early distributions from qualified retirement plans. Paragraph (1), which imposes the tax, provides in relevant part as follows:

> (1) Imposition of additional tax.--If any taxpayer receives any amount from a qualified retirement plan (as defined in section 4974(c)), the taxpayer's tax under this chapter for the taxable year in which such amount is received shall be increased by an amount equal to 10 percent of the portion of such amount which is includible in gross income.

Pursuant to section 4974(c), the term "qualified retirement plan" includes plans described in section 401(a) and individual retirement accounts described in section 408(a). The Retirement System from which petitioner received his Transfer Refund in 1989

is a qualified plan under section 401(a). Additionally, the account from which petitioner received his distribution in 1990 was a valid IRA under section 408(a). Accordingly, absent an applicable exception, the additional tax under section 72(t)(1) applies to the distributions received by petitioners in both 1989 and 1990.

By virtue of paragraph (2)(A)(iii) of section 72(t), the 10-percent additional tax does not apply, inter alia, to distributions attributable to the taxpayer's being disabled (within the meaning of section 72(m)(7)).

We have already decided that petitioner was disabled within the meaning of section 72(m)(7) when he received the Transfer Refund. Accordingly, petitioners are not liable for the additional tax imposed by section 72(t) for either of the taxable years in issue.

IV.  Excise Tax Issues

We turn next to respondent's excise tax determinations. We begin with section 4973.

Section 4973

Section 4973(a) imposes a 6-percent excise tax on excess contributions to an IRA. As relevant herein, an "excess contribution" is the amount in excess of the amount allowable as a deduction under section 219 (computed without regard to section

219(g)), exclusive of amounts properly rolled over tax free. Sec. 4973(b).

In view of our conclusion, _supra_, that petitioner's Transfer Refund qualifies for tax-free rollover treatment in 1989 under section 402(a)(5)(D), petitioner is not liable for the excise tax under section 4973(a).

### Section 4980A

Finally, we turn to section 4980A. Section 4980A(a) imposes a 15-percent excise tax on excess distributions from qualified retirement plans. As relevant herein, an "excess distribution" is defined as the aggregate amount of the retirement distributions with respect to any individual during any calendar year to the extent that such amount exceeds $150,000. Sec. 4980A(c)(1). However, pursuant to section 4980A(c)(2)(D), a retirement distribution is not an "excess distribution" if the retirement distribution is not included in gross income by reason of a rollover contribution.

In view of our conclusion, _supra_, that petitioner's Transfer Refund qualifies for tax-free rollover treatment in 1989 under section 402(a)(5)(D), petitioner is not liable for the excise tax imposed by section 4980A for 1989.

For 1990, petitioner withdrew an amount in excess of $150,000 from his IRA with First National. Accordingly,

petitioner is liable for the excise tax imposed by section 4980A for 1990.[20]

V. <u>Conclusion</u>

In order to give effect to our disposition of the disputed issues, as well as the parties' concessions,[21]

<u>Decision will be entered under Rule 155</u>.

---

[20] See <u>supra</u> note 15 and accompanying text.  Further, we note that petitioner is not entitled to the offset provided by sec. 4980A(b) in view of our conclusion, <u>supra</u>, that petitioners are not liable for the 10-percent additional tax under sec. 72(t).

[21] See <u>supra</u> note 6.