106 T.C. No. 18


UNITED STATES TAX COURT


ROBERT J. DWYER AND CATHERINE DWYER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 2626-95.                    Filed May 15, 1996.


P husband, age 53 at the time, made a premature
withdrawal from his individual retirement account (IRA)
in 1989.  P was actively engaged as a stock trader
specializing in trading corporate stock on a short-term
basis throughout 1989.  During the latter part of the
year he was diagnosed as suffering from clinical
depression.  <u>Held</u>:  Ps are liable for the 10-percent
additional tax on the premature IRA withdrawal.  Sec.
72(t), I.R.C.  Although Ps claimed the exception for
disability contained in sec. 72(t)(2)(A)(iii), I.R.C.,
P husband was not "disabled" within the definition of
that term contained in sec. 72(m)(7), I.R.C. and sec.
1.72-17A(f), Income Tax Regs., since he was not
prevented by his illness from engaging in any
substantial gainful activity.

Robert J. Dwyer and Catherine Dwyer, pro se.

Andrew J. Mandell, for respondent.

NIMS, Judge:  For the year 1989, respondent determined the following deficiency in petitioners' Federal income tax and penalties:

|  | Addition to Tax | Penalty |
| Deficiency | Sec. 6651(a)(1) | Sec. 6662(a) |
| $79,092 | $19,773 | $15,818 |

Unless otherwise stated, all section references are to sections of the Internal Revenue Code in effect for the year 1989, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions, the only issue remaining for decision is whether petitioners are liable under section 72(t) for the 10-percent additional tax on an early distribution from a qualified retirement plan.

## FINDINGS OF FACT

Some of the facts were stipulated and are so found.  The stipulation of facts and attached exhibits are incorporated herein by this reference.  Petitioners resided in Remsenburg, New York, when they filed their petition.

Robert J. Dwyer (petitioner or Robert) is a stock trader, specializing in trading corporate stock on a short-term basis.  He was 53 years old in 1989.

Sometime in 1989, petitioner organized Hampton Partners, of which he was the sole general partner and one of three limited partners. The three limited partners contributed a total of $1,750,000 to Hampton Partners, with petitioner contributing $250,000.

Hampton Partners was formed with the objective that petitioner would use the contributed capital to generate profits in the stock market. During the first six months of 1989 petitioner made numerous stock trades that generated large profits. However, in the latter part of the year the partnership lost a substantial amount in a trade involving stock of United Airlines. A dispute then arose among the partners, resulting in lawsuit's being filed involving claims by the other partners against petitioner, and a counterclaim by him against them.

Petitioner repaid the other partners, against the advice of his accountant, in the way he thought the money should go back, but the partners were not satisfied. Petitioner had never been sued before, and he found the litigation to be very stressful and career threatening.

In October, 1989, petitioner withdrew $208,802 from his individual retirement account (IRA), out of which amount he placed $200,000 in his own brokerage account. The $208,802 was reported as a taxable distribution on petitioners' 1989 Form 1040.

During the last three months of 1989 petitioner traded in excess of 350 stocks, and had stock sales for his own account grossing over $20 million. Petitioner felt that if he could somehow stay in business as a "big butter and egg man", he could somehow "float into nirvana", but instead he "floated down the East River", since he lost a substantial part of the $208,802 he had withdrawn from his IRA. Petitioner intended to treat the IRA withdrawal as a loan that he intended to repay with the money he earned through his stock trading, but because of his continuing losses he was unable to do so.

Sometime in 1989 petitioner was diagnosed as having a biochemical depression. As a result of the acrimonious lawsuit, which at the time seemed to petitioner to have resulted almost from a character failure on his part, petitioner's clinical depression significantly deepened. In the opinion of Dr. Steven Gardner, a Diplomate of the American Board of Psychiatry and Neurology, depression is recognized to be a devastating psychiatric disease. According to Dr. Gardner, the etiology of depression is multifactorial and the evolution of the signs and symptoms, and the degree of dysfunction, are neither abrupt nor uniform.

The first physician with whom petitioner consulted in 1989 placed him on a combined medication consisting of Prozac and Pamelor, which were subsequently found to be counteracting each

other, giving petitioner no relief from his condition and causing him to be very disoriented. Subsequently, petitioner consulted a second physician, Dr. Gardner, who prescribed only Pamelor, which, in about six weeks' time, cleared up petitioner's condition. Petitioner continued to see Dr. Gardner for about two years, but discontinued seeing him after that time because he could no longer afford the consultation fees. Petitioner is no longer on medication. Petitioner regularly exercises to avoid "putting myself in positions any longer where I can have this kind of a setback."

Respondent determined an additional tax of $20,880 on the $208,802 premature distribution from petitioner's IRA.

OPINION

The legislative history accompanying the enactment of former section 408(f) explains the purpose of what is now section 72(t), as follows: Premature distributions from IRAs frustrate the intention of saving for retirement, and section 72(t) discourages this from happening. S. Rept. 93-383 at 134 (1974), 1974-3 C.B. (Supp.) 80, 213. Thus, in the event of a distribution to an individual from his or her IRA before such individual attains age 59-1/2, the individual's tax on the amount distributed is increased by 10 percent of the total distribution. H. Conf. Rept. 93-1280, at 339 (1974), 1974-3 C.B. 415, 500.

Section 72(t)(1) and (2) provides in relevant part:

SEC. 72(t). 10-Percent Additional Tax on Early Distributions From Qualified Retirement Plans.--

(1) Imposition of additional tax.--If any taxpayer receives any amount from a qualified retirement plan (as defined in section 4974(c)), the taxpayer's tax under this chapter for the taxable year in which such amount is received shall be increased by an amount equal to 10 percent of the portion of such amount which is includible in gross income.

(2) Subsection not to apply to certain distributions.--Except as provided in paragraphs (3) and (4), paragraph (1) shall not apply to any of the following distributions:

(A) In general.-- Distributions which are--

* * * * * * *

(iii) attributable to the employee's being disabled within the meaning of subsection (m)(7),

Section 72(m)(7) provides:

(7) Meaning of disabled.--For purposes of this section, an individual shall be considered to be disabled if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration. An individual shall not be considered to be disabled unless he furnishes proof of the existence thereof in such form and manner as the Secretary may require.

S. Rept. 93-383, supra at 134, 1974-3 C.B. (Supp.) at 213 states that "Generally it is intended that the proof [of disability] be

the same as where the individual applies for disability payments under social security."

The regulations, promulgated pursuant to the statutory authorization contained in section 72(m)(7), provide that an individual will be considered to be disabled if he or she is unable to engage in any "substantial gainful activity" by reason of any medically determinable physical or mental impairment that can be expected to result in death or to be of long-continued and indefinite duration. Sec. 1.72-17A(f)(1), Income Tax Regs. Significantly, the regulations also provide that an impairment which is remediable does not constitute a disability. Sec. 1.72-17A(f)(4), Income Tax Regs.

Notwithstanding the apparent severity of petitioner's illness in 1989, which, according to Dr. Gardner, persisted into the spring of 1992, the illness did not fall within the definition of "disabled" as contemplated by sections 72(t)(1) and (2) and 72(m)(7), and the regulations thereunder. Petitioner continued to function as an active stock trader in the face of his clinical depression, and in fact withdrew his IRA funds to further that activity. Thus, his condition fails to meet the regulatory requirement that the individual be so impaired as to be unable to engage in any substantial gainful activity. Sec. 1.72-17A(f)(4), Income Tax Regs.

Petitioners argue that Robert's activities during 1989 resulted in a net loss of $94,000, which, they say, is not an indication of participating in a "gainful activity". But we have held in another context, which by analogy is relevant here, that a taxpayer may be engaged in a profit-making activity, even without actually making a profit in a given year, if the individual has an actual and honest profit-making objective. See Dreicer v. Commissioner, 78 T.C. 642, 646 (1982), affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983). We equate a "substantial gainful activity" in this context with an "actual and honest objective of making a profit." Obviously, petitioner did not have failure to make a profit as his objective, even though as it turned out he failed to make a profit from his trading activities in 1989.

Petitioners criticize, as being too restrictive, the regulatory standard of a mental disease impairment that would be considered as preventing gainful activity. The standard is contained in section 1.72-17A(f)(2)(vi), Income Tax Regs., which reads as follows:

> (vi) Mental diseases (e.g., psychosis or severe psychoneurosis) requiring continued institutionalization or constant supervision of the individual;

Petitioners argue that Robert was under "constant supervision" for two years and that the alternative regulatory

requirement of "continued institutionalization" is outdated because "medical practice in the latter part of the 20th century attempts NOT to institutionalize patients". The fact that Robert was never institutionalized does not, of course, mean that the issue must automatically be decided in favor of the Government, but we do not believe that Robert's psychiatric consultations rise to a level that could properly be categorized as "constant supervision". Petitioners assert that more Americans are affected annually by clinical depression than by heart disease or cancer. We would simply respond by recognizing that many seek professional help with the expectation (or hope) that their depression manifestations can be alleviated, just as persons suffering from other illnesses, many of them quite serious, seek and obtain periodic medical assistance to alleviate their conditions. But periodic professional consultation (such as petitioner's) alone does not, in our judgment, equate with the constant supervision envisioned by the regulation. And petitioners have not suggested that Robert suffered from psychosis or severe psychoneurosis such as would require his continued, constant supervision.

Petitioners also assert that the remediability of petitioner's condition was uncertain in 1989, and that the fact that the condition abated is a tribute to medical science, but was by no means a certainty in 1989. While this may or may not

be true, we would again point out that regardless of the potential permanency of his condition, or the absence thereof, petitioner was not so impaired as to be unable to actively pursue the substantial gainful activity of securities trading in which profession he was engaged throughout the year in question.

In conclusion, we might also point out that Congress has provided a means of access to IRAs before retirement in some cases of medical problems which, though serious, do not result in permanent disability. Section 72(t)(2)(B) permits premature IRA distributions without penalty to the extent such distributions do not exceed the amount allowable as a deduction under section 213 for medical care (determined without regard to whether an individual itemizes deductions). Petitioners have not claimed the protection of this section, presumably because they reported only $5,481 in unreimbursed medical and dental expenses on their 1989 Form 1040, which amount was not deductible by petitioners because it did not exceed 7.5 percent of their adjusted gross income, as required by section 213(a).

For the foregoing reasons we hold that petitioners are liable for the 10-percent additional tax on a premature distribution from Robert's qualified plan in 1989, pursuant to section 72(t). See also, to the same effect, Kovacevic v. Commissioner, T.C. Memo. 1992-609, and Kane v. Commissioner, T.C. Memo. 1992-218. To reflect this holding and concessions,

Decision will be entered

under Rule 155.