T.C. Summary Opinion 2003-53


UNITED STATES TAX COURT


BRIAN P. KEELEY AND MARY G. KEELEY, Petitioners $\underline{v}$.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 1019-02S.               Filed May 15, 2003.


Brian P. Keeley and Mary G. Keeley, pro sese.

David S. Weiner, for respondent.


ARMEN, Special Trial Judge:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect at the time that the petition was filed.[1]  The decision to be entered is not reviewable by any other court, and this opinion should not be cited as authority.

---

[1]  Unless otherwise indicated, all subsequent section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent determined deficiencies in petitioners' Federal income taxes for the taxable years 1997 and 1998 in the amounts of $5,400 and $1,228, respectively.[2]

After a concession by respondent,[3] the issue for decision is whether petitioners are liable under section 72(t) for the 10-percent additional tax on early distributions from qualified retirement plans.  We hold that they are.

Background

Some of the facts have been stipulated, and they are so found.  Petitioners resided in Chicago, Illinois, at the time that their petition was filed with the Court.

Petitioner Mary G. Keeley (Mrs. Keeley) worked part-time for the West Chicago School District in 1997 for a time period not disclosed in the record.  From the end of December 1997 to the present, Mrs. Keeley has been working for Tyndale House Publishers.

Petitioner Brian P. Keeley (Mr. Keeley) worked as a leasing manager with Hughes Enterprises, a commercial laundry equipment distributor, for some time until August 1996.  In August 1996, Mr. Keeley left Hughes Enterprises because he was dissatisfied with the annual reduction in his base salary and commission

---

[2]  All numbers are rounded to the nearest dollar.

[3]  At trial, respondent conceded the erroneous disallowance of a $400 child tax credit that petitioners claimed in 1998.

schedule over the previous 3 to 4 years. Because of his past experience in the insurance industry, Mr. Keeley decided to become a self-employed insurance broker. In September 1996, Mr. Keeley began to work on a commission basis as an insurance broker with New York Life Insurance Co. (New York Life). By mid-1997, Mr. Keeley stopped working as an insurance broker because he failed to meet New York Life's application approval rate.

Around this time, Mr. Keeley suffered a mental breakdown as a result of "not being able to support the family, having what I felt was a good situation turn into what was a very bad situation at that point in time, that being the self-employment opportunity". In addition, Mrs. Keeley thought that Mr. Keeley's depression "robbed him of the confidence to do his job successfully" such that "by March [of 1997], he could not function on the job at all" and that "during the summer and early autumn, he spent a good part of the day in bed". Thus, Mr. Keeley became unemployed for several months, except for small jobs, e.g., delivering newspapers and collecting donations.

As a result of petitioners' financial hardship,[4] Mr. Keeley withdrew funds in 1997 from his individual retirement account

---

[4] Mr. Keeley testified that in 1997 his income declined to $3,000. We note, however, that on their 1997 return, petitioners reported gross wages of $15,705 ($3,115 of which was earned by Mr. Keeley), and on a Schedule C, Profit or Loss From Business, attached to their return, Mr. Keeley reported gross receipts of $13,140 and a net profit of $4,766.

(IRA) with National Financial Services Co. (National) in the amount of $54,000. At the time, Mr. Keeley was 52 years of age. In December 1997, Mr. Keeley started work as a sales representative at Advanced Telecommunications, Inc. (ATI) and remains currently employed there. Mr. Keeley earned $3,115 with ATI in 1997 and $44,352 in 1998.

In 1998, Mr. Keeley withdrew the remaining IRA balance at National in the amount of $5,280. Mrs. Keeley also withdrew the balance of her Illinois Municipal Retirement Fund[5] (pension) in the amount of $2,998. At the time, Mrs. Keeley was 52 years of age and not disabled. Petitioners used the entire balance in the National and pension accounts "to survive and pay our bills", e.g., their mortgage and daughter's college loans.

With respect to Mr. Keeley's medical history, he has been diagnosed with anxiety, depression, and panic disorder for which he has been receiving treatment from his internist, Scott McNaughton, M.D. (Dr. McNaughton). According to Dr. McNaughton, Mr. Keeley "has been treated with medication in 1994 and required several physician visits for follow up and medicine adjustment during 1997 and 1998".

In addition, Mr. Keeley had been seeing David E. Dillon,

---

[5] Neither party has raised any issue regarding the status of Mrs. Keeley's retirement fund as a "qualified retirement plan", see sec. 4974(c)(1), and the record provides no basis for us to conclude that it was not.

Ed.D. (Dr. Dillon), a licensed psychologist, to deal with his depression and various childhood issues.[6] During the years in issue, Mr. Keeley had at least one or two sessions monthly with Dr. Dillon.[7] According to a letter dated October 24, 2000, from Dr. Dillon:

> [Mr. Keeley] was under my care as a psychologist, treating moderately severe symptoms associated with depression. Mr. Keeley reported feeling depressed and exhibited symptoms of low energy, sadness, somatic complaints, anhedonia, and hopelessness, all of which are consistent with a depressed condition. Depression lasting longer than two weeks is often considered serious enough for medical and psychological intervention.
>
> Such a depression is often triggered by a combination of serious social and/or career disappointments coupled with an innate tendency toward depression. Mr. Keeley suffered two serious set backs which appear to account for the onset of depression: 1) a change in jobs following several alterations of tasks and financial remuneration at Hughes Enterprises; 2) although successful as a New York Life agent, Mr. Keeley was unable to sell enough insurance to overcome the company's rejection rate. After this he floundered in one menial job after another until his present employment with ATI. At the time, neither he nor I could have predicted how long these conditions and his

---

[6] The record does not disclose when Mr. Keeley initiated treatment with Dr. Dillon. However, Mr. Keeley submitted to the Court copies of Dr. Dillon's bills dating as far back as May 17, 1996.

[7] Based on the receipts in the record, we note that Mr. Keeley had 13 90-minute sessions and one 45-minute session with Dr. Dillon in 1997; 10 90-minute sessions in 1998; eight 90-minute sessions in 1999; one 90-minute session in 2001; and two 90-minute sessions in 2002. Mr. Keeley testified that he normally did 90-minute sessions because Dr. Dillon's office was located approximately 1 hour and 15 minutes from Mr. Keeley's residence.

depression would last.

In another letter dated August 11, 1998, Dr. Dillon states that Mr. Keeley's depression "impaired his ability to make decisions, and thus could have affected his ability to get and hold a job.  Depression is known to keep a person from making clear and forceful decisions."  Petitioners testified that they thought that Mr. Keeley's depression was for an indefinite duration.  Mrs. Keeley also testified that, at present, she observes the continuing effects of Mr. Keeley's depression such that "any tasks, job-related or home-related, take him much longer to complete".

Also, Mr. Keeley was diagnosed in June 1997 with a herniated disk and bone spur in his neck, which had been causing him discomfort for several years.  This condition caused weakness and pain in his left shoulder and arm, which resolved around November and December 1997.  For this condition, Mr. Keeley received medication, physical therapy, a neurosurgical evaluation, and magnetic resonance imaging.

Petitioners timely filed joint Forms 1040, U.S. Individual Income Tax Return, for 1997 and 1998.  On both returns, Mr. Keeley listed his occupation as "sales rep" and Mrs. Keeley listed her occupation as "secretary".  Petitioners reported as income their respective IRA and pension distributions received during the taxable years 1997 and 1998.  For each distribution,

petitioners did not compute the 10-percent additional tax imposed by section 72(t).  However, petitioners attached to both returns several letters from Mr. Keeley's physicians and a statement as follows:

> Form 5329[8], Line 2 Distributions exempt from tax –
>     The taxpayer became permanently disabled in 1997 with respect to his employment as an insurance broker as a result of neurological and spinal conditions, which prevent the taxpayer from engaging in customary substantial gainful activities (See medical opinions attached).  The taxpayer continues to be disabled.  Accordingly, distributions from the taxpayer's IRA account are not subject to the 10% penalty for early withdrawal.

During the examination of petitioners' returns, petitioners received a letter dated September 25, 2000, from respondent's tax examiner stating that respondent does not "dispute the contention regarding the taxpayer's ability to perform substantial gainful activity", but contends that petitioners did not provide substantiation (physician's letters) stating that "Mr. Keeley is 'totally and permanently' disabled or his condition was expected to result in death or to be of long continued or indefinite duration."  Petitioners submitted a response referring to the letters attached to petitioners' returns and also attaching a copy of Dr. Dillon's letter dated October 24, 2000.

---

[8] Form 5329 is entitled "Additional Taxes Attributable to Qualified Retirement Plans (Including IRAs), Annuities, Modified Endowment Contracts, and MSAs".  Part I of the form is entitled "Tax on Early Distributions".  A taxpayer would report on Line 2 of Part I of the form "Distributions excepted from additional tax".

In the notice of deficiency, respondent determined that petitioners are liable for the 10-percent additional tax on each of the early distributions from petitioners' retirement accounts.

Petitioners timely filed a petition with the Court disputing the determined deficiencies.  Paragraph 4 of the petition states, in pertinent part, as follows:

> We feel very strongly that Brian did qualify for the medical/disability exemption from the penalty for early withdrawal.  We do have supporting documentation from medical professionals.

On brief, petitioners argue:

> While [Mr. Keeley] is able to work, he cannot return to occupations that require strategic thinking, planning and the related stress and responsibility, lest he have a reoccurrence of that afflicted state [of depression]. * * * Mr Keeley no longer has the capacity to sell insurance, the commissions from which would generate substantially more income than his present in-house desk sales function for his employer [ATI], a telephone retailer.

Discussion[9]

Generally, section 72(t)(1) imposes a 10-percent additional tax on early distributions from qualified retirement plans,[10] unless the distribution comes within one of several statutory exceptions.  For example, distributions that are made on or after

---

[9]  We decide the principal issue in this case without regard to the burden of proof.  See sec. 7491(a)(1); Rule 142(a); Higbee v. Commissioner, 116 T.C. 438 (2001).

[10]  As relevant to the present case, a "qualified retirement plan" includes an individual retirement account (IRA) and a qualified pension or profit sharing plan.  Sec. 4974(c)(1), (4).

the date on which the taxpayer attains the age of 59-½ are not
"early" and therefore not subject to the additional tax.  Sec.
72(t)(2)(A)(i).  As relevant to the present case, section
72(t)(2)(A)(iii) provides an exception for distributions
"attributable to the employee's being disabled within the meaning
of subsection (m)(7)".[11]  There are also limited exceptions
available for distributions made to an employee for medical care
expenses, sec. 72(t)(2)(B),[12] and for qualified higher education
expenses, sec. 72(t)(2)(E).

Petitioners contend that the exception under section
72(t)(2)(A)(iii) applies because Mr. Keeley was disabled during
the years in issue because of severe depression that petitioners
thought was indefinite and for which Mr. Keeley is still under
medical treatment.  On the other hand, respondent argues that Mr.
Keely was not disabled because "a long-term psychiatric illness
where petitioner [Mr. Keeley] is able to work and where there
wouldn't be a need for some type of constant treatment" is
inconsistent with the definition of disability under section

---

[11]  For purposes of sec. 72(t), the term "employee" includes
participants in individual retirement plans.  Sec. 72(t)(5).

[12]  In the petition, petitioners appear to contend that the
exception for medical expenses under sec. 72(t)(2)(B) may apply.
However, petitioners did not present any evidence in support of
this contention, presumably because their unreimbursed medical
and dental expenses on both returns did not exceed 7.5 percent of
their adjusted gross income.  See sec. 213(a); Dwyer v.
Commissioner, 106 T.C. 337, 343 (1996).

72(m)(7).  Respondent further argues that Mr. Keeley's continued psychological consultations do not constitute "constant treatment".

Section 72(m)(7) provides:

> (7) Meaning Of Disabled.--For purposes of this section, an individual shall be considered to be disabled if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration.  An individual shall not be considered to be disabled unless he furnishes proof of the existence thereof in such form and manner as the Secretary may require.[13]

The determination of whether a taxpayer is disabled is made on the basis of all the facts.  Sec. 1.72-17A(f)(2), Income Tax Regs.  The regulations also set forth general considerations upon which a determination of disability is to be made such as the nature and severity of the impairment.  Sec. 1.72-17A(f)(1), Income Tax Regs.  However, the regulations emphasize that the "substantial gainful activity" to which section 72(m)(7) refers is the activity, or a comparable activity, in which the individual customarily engaged prior to the disability.  Id. Therefore, the impairment must be evaluated in terms of whether it does, in fact, prevent the individual from engaging in his customary, or any comparable, substantial gainful activity

---

[13] Generally, proof of disability is the same as where the individual applies for disability payments under Social Security. S. Rept. 93-383, at 134 (1974), 1974-3 C.B. (Supp.) 80, 213.

considering the individual's education, training, and work experience. Sec. 1.72-17A(f)(2), Income Tax Regs. As an example of a disability, the regulations list "Mental diseases (e.g., psychosis or severe psychoneurosis) requiring continued institutionalization or constant supervision of the individual". Sec. 1.72-17A(f)(2)(vi), Income Tax Regs. The impairment, however, must be expected either to continue for a long and indefinite period or to result in death. Sec. 1.72-17A(f)(3), Income Tax Regs. In this context, the term "indefinite" means that it cannot reasonably be anticipated that the impairment will, in the foreseeable future, be so diminished as no longer to prevent substantial gainful activity. Id. However, an impairment that is remediable does not constitute a disability. Sec. 1.72-17A(f)(4), Income Tax Regs. More specifically, the regulations provide that "An individual will not be deemed disabled if, with reasonable effort and safety to himself, the impairment can be diminished to the extent that the individual will not be prevented by the impairment from engaging in his customary or any comparable substantial gainful activity." Id.

Based on the record, we assume arguendo that Mr. Keeley's depression affected his ability to engage in substantial gainful activity during the years in issue.[14] Nevertheless, we are

_____

[14] We note that, during the examination of petitioners' returns, respondent did not dispute Mr. Keeley's contention that
                                                        (continued...)

constrained to sustain respondent's determination for the reasons below.

Petitioners assert that Mr. Keeley's depression was expected to last for a long and indefinite period.  Although we are sensitive to the severity of Mr. Keeley's mental health problems and the fact that he continues to take antidepressants and receive psychological counseling, we conclude that his state of depression does not qualify as a "mental disease", as defined under section 72(m)(7), requiring continued institutionalization or constant supervision.  See Dwyer v. Commissioner, 106 T.C. 337, 342 (1996) (The taxpayer suffered from severe depression for which he had periodic consultations with a psychologist; the Court held that periodic professional consultation alone does not equate with the constant supervision envisioned by the regulation).  Further, based on the record, Mr. Keeley's psychological condition is not irremediable within the meaning of section 1.72-17A(f)(2), Income Tax Regs.  Therefore, we must sustain respondent's determination as to Mr. Keeley's IRA distributions.

In addition, the record demonstrates that Mrs. Keeley was not disabled during the years in issue or that any exception to

---

[14](...continued)
he was not able to perform substantial gainful activity. However, we note further that Mr. Keeley began working at ATI in December 1997 and in 1998 earned a gross salary of $44,352 from ATI.

the imposition of additional tax under section 72(t) applies to her. Therefore, we also sustain respondent's determination as to Mrs. Keeley's pension distribution.

We note that although petitioners do not expressly rely on section 72(t)(2)(E)[15] for the distributions they received in 1998, they testified that one purpose for the distributions was to pay for their daughter's college loans. However, petitioners did not present any evidence for this Court to determine whether this exception applies in the present case.

In closing, we think it appropriate to observe that we found petitioners to be very conscientious taxpayers who obviously take their Federal tax responsibilities quite seriously. We are also sympathetic to the hardship that Mr. Keeley's mental health problems have brought to petitioners' lives, and we acknowledge that petitioners used the IRA and pension distributions for laudable purposes. Nevertheless, we are constrained to hold for respondent based on the applicable law.

Reviewed and adopted as the report of the Small Tax Case Division.

To give effect to our disposition of the disputed issue, as

---

[15] The exception from the additional tax for qualified higher education expenses applies only "to distributions after Dec. 31, 1997, with respect to expenses paid after such date (in taxable years ending after such date), for education furnished in academic periods beginning after such date". Taxpayer Relief Act of 1997, Pub. L. 105-34, 111 Stat. 809.

well as respondent's concession,

Decision will be entered

under Rule 155.