T.C. Summary Opinion 2008-165


UNITED STATES TAX COURT


CYNTHIA M. MARTINEZ, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 12652-06S.          Filed December 29, 2008.


Cynthia M. Martinez, pro se.

<u>Linette B. Angelastro</u>, for respondent.


GOLDBERG, <u>Special Trial Judge</u>:  This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect at the time the petition was filed.  Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case.  Unless otherwise indicated, subsequent

section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent issued a notice of determination dated May 4, 2006, denying petitioner's request for innocent spouse relief from joint and several liability for 1992, 1995, 1998, and 1999, which as of April 17, 2007, had remaining balances due of $7,038, $1,914, $4,882, and $5,965, respectively, for a total of $19,799. The issue for decision is whether petitioner is entitled to innocent spouse relief for any or all of the years at issue.

## Background

Some of the facts have been stipulated and are so found. The stipulations of facts and the attached exhibits are incorporated herein by this reference. Petitioner resided in California when she filed her petition.

Petitioner married Frank Martinez in 1971 when they were both young, and they remained loving partners until his death 30 years later on April 2, 2001, at age 47. Mr. Martinez died after struggling since 1985 with worsening pancreatic problems, which compounded quickly with diabetes and then diabetes II. Later, doctors discovered a hole in his colon. These deteriorating conditions required frequent doctor's care, hospital stays, many operations, removal of two-thirds of his colon, four shots per day of insulin, and spending every night at home pumping fluids out of his body. Petitioner nursed him at home. The medical

problems remained unanswerable, and despite everyone's efforts, Mr. Martinez died, as noted above, on April 2, 2001.[1]

Mr. Martinez started out serving in the U.S. Air Force for 8 years. After an honorable discharge he eventually secured a job as a telephone service representative for Pacific Bell, a telephone company. He worked there from 1981 until July 28, 1995, when he had to stop working because of his declining health.

Petitioner has 13 years of education. She at first stayed at home as a housewife raising their two children, and then she worked in different jobs: Marketing, graphic artist, and later as a secretary for Ingersoll Dresser Pump Co., which was her employer during the years at issue.

The Martinezes' financial arrangement was that their bank account was in petitioner's name, but Mr. Martinez decided which bills to pay and when to pay them. The record is not clear as to whether Mr. Martinez had signatory authority over the account. Petitioner did not review the monthly bank statements, did not balance the checkbook, and did not pick up or open the mail. Regarding their tax returns, Mr. Martinez would show her a

---

[1] The death certificate shows that his immediate causes of death were cardiorespiratory arrest and a ruptured aortic aneurysm, with contributing factors of diabetes mellitus and renal insufficiency.

preliminary draft, then had her sign a blank original so that he could complete and mail the return.

Before the years at issue the Martinezes had a balance due for their Federal income tax for 1988, 3 years after the medical problems began. The Internal Revenue Service (IRS) collected the unpaid balance by means of a levy in 1994. At trial petitioner acknowledged that she was aware of the 1994 levy, but thought that Mr. Martinez went back to paying the balance due on the income tax returns that they filed afterwards.

The couple's tax problems began in earnest in 1991. By then Mr. Martinez's health had been deteriorating significantly for about 6 years to the point where he was in and out of work frequently for short- and long-term disability to take care of his medical problems. Below is a table showing for the years at issue the balances due, attribution, and other pertinent information:

| Year | Date IRS Received Return | Balance Due On Tax Return | Balance Attrib. To Petitioner | IRS Applic. Of Pet.'s Payments | Bal. Due As Of 4/17/07 |
|------|------|------|------|------|------|
| 1992 | 11/4/98 | $3,054 | $1,680 | $3,207 | $7,038 |
| 1995 | 11/4/98 | 6,851 | 4,316 | 11,666 | 1,914 |
| 1998 | 4/15/99 | 2,822 | [1]2,794 | 775 | 4,882 |
| 1999 | 9/22/00 | 2,650 | 2,645 | -0- | 5,965 |
| Total |  | 15,377 | 11,435 | 15,648 | 19,799 |

[1]Of the couple's 1999 adjusted gross income of $37,611, only $71 of dividend income, or less than 1 percent, was attributable to Mr. Martinez. The record is silent on attribution for 1998, but because Mr. Martinez had been drawing down his investments and retirement funds since he stopped working in 1995, we estimate that he had a small investment residual in 1998 that continued shrinking into 1999. As a consequence, we find petitioner was 99 percent liable for the 1998 liability and 100 percent for the 1999 liability.

In 1992 petitioner and Mr. Martinez earned equivalent wages, had equivalent withholdings, earned $4,967 in investment income, and withdrew $485 from petitioner's retirement fund. The draw of retirement funds at her age, late thirties, is an indication of the Martinezes' worsening financial condition. Petitioner was 55 percent responsible for the 1992 underpayment.

By 1995 the Martinezes were experiencing significant troubles. In July of 1995 Mr. Martinez, at only age 41, had to stop working because of his health problems, and he was never able to return. Their two children were still dependents. To make ends meet, the Martinezes withdrew $21,809 from their retirement plans: $18,840 from Mr. Martinez's plan and $2,969

from petitioner's plan.  In calculating their tax liability for 1995 their preparer properly included the withdrawals in the Martinezes' gross income.  The preparer also reported a 10-percent additional tax of $2,181 for premature distributions from retirement plans:  $1,884 attributable to Mr. Martinez, and $297 attributable to petitioner.

The IRS mistakenly attributed only 8 percent responsibility to petitioner for the 1995 underpayment because the IRS failed to give Mr. Martinez credit for the 20 percent withholding on his retirement plan withdrawal.  After crediting Mr. Martinez with the proper withholdings, the correct attribution to petitioner is 63 percent.  The reason for petitioner's higher percentage is that although she and Mr. Martinez had similar amounts of taxes withheld from their wages, she earned about twice as much pay because Mr. Martinez stopped working around mid-1995.

In 1996 the Martinezes moved from southern to northern California where they hoped they could live a less stressful life.  They had read that adrenalin in the fight-or-flight response to stress worsened diabetes.  Mr. Martinez told petitioner he was going to transfer to a Pacific Bell office up north, but he had in fact already stopped working on July 28, 1995.  He hid this fact from petitioner.

Shortly after the move in 1996 petitioner learned that Mr. Martinez had not filed their 1992 and 1995 tax returns.  To

prepare their delinquent returns the Martinezes engaged a regional law firm that specialized in taxes. After 2 years the law firm completed the returns and dated its preparer signature October 19, 1998. The Martinezes dated their signatures October 30, 1998, and they promptly filed the returns such that respondent recorded receiving the returns on November 4, 1998.

Regarding the final 2 years at issue, 99 percent of the 1998 underpayment and 100 percent of the 1999 underpayment were attributable to petitioner, except for some minor interest income, as her job was the couple's only source of income. In 1998 petitioner's withholdings of $212 were less than 1 percent of her earnings, and in 1999 her withholdings were less than 3 percent of her earnings.

For all 4 years at issue, 1992, 1995, 1998, and 1999, the Martinezes claimed the standard deduction and accordingly did not itemize their deductible expenses.

By the end of 1998 or 1999, the couple had no financial resources other than petitioner's paycheck. Mr. Martinez had stopped working in 1995, and they had exhausted their retirement accounts and emptied their after-tax investments and savings. On petitioner's salary in the low- to mid-thirty thousands, they lived in California, a high cost-of-living State, and had to contend with medical bills while Mr. Martinez was in and out of doctors' offices and hospitals. Petitioner later discovered that

because of pride, or financial concern, or the mental effect of diabetes, Mr. Martinez was not filling some of his prescriptions, was ignoring certain medical devices, and was not requesting medical reimbursements. Petitioner stated that if Mr. Martinez had purchased better medicines and better equipment and sought health care reimbursements, they might have lessened some of their problems.

Sometime in 1999 or 2000 petitioner found Mr. Martinez at home, unconscious, in a coma. Paramedics rushed him to a hospital. He revived but felt numbness in his feet. He died, as noted above, on April 2, 2001.

Shortly before Mr. Martinez's death, while she was looking for medical supplies, petitioner discovered shoe boxes full of unopened letters from the IRS and tax returns that she had signed but Mr. Martinez had not mailed. Petitioner reengaged the same law firm that had prepared the prior delinquent returns to resolve the matter. The firm determined that the Martinezes had outstanding balances for each of the 8 years 1992 to 2000, except for 1996 where they had a refund due. The total amount due, including additions, was $48,684. On behalf of the Martinezes the law firm prepared an offer-in-compromise, offering $1,000 to settle the entire debt. The firm submitted the offer to the IRS during the summer of 2001 after Mr. Martinez's death in April 2001.

By February 2002 for unclear reasons but perhaps because the IRS indicated that it was going to reject the offer, petitioner notified the law firm that she had decided to enter into an installment agreement with the IRS instead of pursuing the offer-in-compromise. Petitioner signed a Form 433-D, Installment Agreement, dated it March 27, 2002, and agreed to pay $775 per month to resolve the entire accumulated debt of $48,684 for 1992 through 2000.

Petitioner began making the installment payments in May 2002. Although the record is not entirely clear, it appears that she kept making the monthly payments until November 2005 and then made about four additional monthly payments of $775 in 2006 (February through May 2006). Petitioner stopped making payments in 2005 because the IRS stopped sending her monthly payment coupons. In total petitioner paid approximately $35,650 in installment payments ($775 times 46 months). The IRS applied the couple's 1996 refund to the 1993 underpayment. The record is silent on the amount of that refund.

Petitioner's payments of approximately $35,650 represent 73 percent of the entire $48,684 debt. The IRS applied the installment payments in a seemingly haphazard manner, extinguishing in full the balances owing on 1993, 1994, 1997, and 2000 while leaving balances due on 1992, 1995, 1998, and 1999.

In July 2002 the IRS sent a Final Notice, IRS Intent to Levy, for 1994 despite, as noted above, having entered into an installment contract just a few months earlier and where petitioner was complying with the payment arrangement. Similarly, in a letter dated April 7, 2004, the IRS requested that petitioner execute a new installment agreement solely for the year 2000 even though petitioner was still performing under the existing installment agreement that included the year 2000.

To help prepare her 2004 tax return in early 2005 petitioner retained a national tax preparation firm, which, when reviewing her records, questioned her regarding the installment payments. After a discussion the firm suggested that she apply to the IRS for innocent spouse relief, which she did around August 2005 for years 1992, 1995, 1998, 1999, and 2000. Petitioner's application included a Form 12510, Questionnaire for Requesting Spouse. The form includes a worksheet for monthly income and expenses, upon which petitioner reported a monthly net income of $2,636 and expenses of $2,480 (including the $775 monthly installment payment to the IRS) for a surplus of $156 per month. In a letter dated December 13, 2005, the IRS compliance division formally denied petitioner's request for innocent spouse relief.

Petitioner timely appealed the denial to the IRS's Office of Appeals. The Appeals officer determined that petitioner was in tax compliance and that petitioner satisfied the IRS threshold

requirements for relief on the portion of the liability attributable to her deceased husband.  However, the Appeals officer rejected petitioner's request for relief because of the following factors:  (1) Reason to know: petitioner did not meet her duty of inquiry because the checking account was in her name, and as noted above, petitioner should have been on alert after a 1994 levy paid off their 1988 tax debt; (2) attribution: in 1999 and 2000 nearly all or all of the underpayments were attributable to petitioner's earnings (the 1998 return was not available, and therefore the officer did not base the decision for 1998 on attribution); (3) economic hardship: paying the debt would not cause petitioner economic hardship because the $156 monthly surplus that petitioner reported on Form 12510 in August 2005 already included a provision of $775 for the monthly repayment of back taxes; (4) Mr. Martinez did not abuse petitioner; and (5) petitioner had no health problems.  The officer did not take into account or did not find relevant the total amount of money and the percentage of the overall income tax debt that petitioner had paid through installment payments.  The Appeals officer also did not talk with petitioner, although the officer did send a preliminary notice of determination to which petitioner never responded.

The IRS sent a notice of determination dated May 4, 2006, to petitioner formally denying innocent spouse relief for all

remaining open years: 1992, 1995, 1998, and 1999. The IRS had been applying most of petitioner's final installment payments during 2005 and 2006 to year 2000 such that by the time of the IRS's notice, year 2000 had a zero balance.

Petitioner received no money or property from her deceased husband's estate. Petitioner moved to Southern California, and doing so was expensive. Petitioner received a small death benefit resulting from the death of her first husband; however, she spent the sum on transporting his body to Southern California and on funeral expenses.

The record does not indicate that the parties conducted a pretrial settlement conference. At trial a little more than 2 years after her initial submission of Form 12510, petitioner presented a new Form 12510 that showed a monthly cashflow shortfall of $322, based on net income of $2,448 and monthly expenses of $2,770. The expenses did not include a provision for the repayment of outstanding taxes. Petitioner remarried on November 7, 2006. Petitioner's worsened financial condition is due to the financial arrangement that she has with her new husband. He has limited income from which he pays the mortgage (the home is solely in his name), and he pays for child support for his child from a prior relationship. She pays the rest of their expenses, including food, utilities, telephone, insurance, and his car payment. She owns a 1992 Honda; however, she drives

his car to work because it is newer and more reliable. Petitioner's employer is downsizing, and to retain her job, she drives a long, expensive commute to a new location.

## Discussion

### I. Overarching Considerations

#### A. Joint and Several Liability

When two individuals file a joint Federal income tax return, they are each responsible for the accuracy of the return and both are liable together and separately for the entire tax liability. Sec. 6013(d)(3); Butler v. Commissioner, 114 T.C. 276, 282 (2000); sec. 1.6013-4(b), Income Tax Regs.

#### B. Section 6015(f) Equitable Relief

Section 6015 provides relief from joint and several liability in certain circumstances. As relevant here, if the taxpayer does not qualify for relief under section 6015(b) or (c), then the taxpayer may seek an equitable remedy under section 6015(f), which provides relief if, after taking into account all the facts and circumstances, it would be inequitable to hold the taxpayer liable for the unpaid tax or any portion thereof. Sec. 6015(f)(2); Butler v. Commissioner, supra at 287-292. Petitioner does not qualify for relief under section 6015(b) or (c) because the joint tax returns reported the full amount of tax due, and therefore the liabilities are due to underpayment of tax, and not

deficiencies.  Accordingly, petitioner's sole avenue of relief is through section 6015(f).

C.  Jurisdiction

In 2006 Congress amended section 6015(e) to expressly grant the Tax Court jurisdiction over the Commissioner's denial of relief under section 6015(f) "'with respect to liability for taxes arising or remaining unpaid on or after the date of the enactment of this Act [December 20, 2006]'."  Christensen v. Commissioner, 523 F.3d 957, 959 (9th Cir. 2008) (quoting Tax Relief and Health Care Act of 2006, Pub. L. 109-432, div. C., sec. 408(c), 120 Stat. 3062), affg. T.C. Memo. 2005-299. Petitioner's liabilities remain unpaid after December 20, 2006, and accordingly, we have jurisdiction.

D.  Standard of Review

Respondent requested in his pretrial memorandum that we limit our review to the administrative file.  In the past, we applied abuse of discretion as the standard of review for the Commissioner's denial of equitable relief under section 6015(f). See Washington v. Commissioner, 120 T.C. 137, 146 (2003); Cheshire v. Commissioner, 115 T.C. 183, 198 (2000), affd. 282 F.3d 326 (5th Cir. 2002).  However, in a recent case we focused specifically on this issue, and we ruled that when seeking section 6015(f) relief, it is permissible for a taxpayer to introduce evidence at trial that was not in the administrative

record.  Porter v. Commissioner, 130 T.C. __ (2008).  Further, we need not decide the standard of review because we would reach the same result.

E.  Burden of Proof

To gain joint and several liability relief under section 6015(f), the taxpayer bears the burden of proof.  Rule 142(a); Alt v. Commissioner, 119 T.C. 306, 311 (2002), affd. 101 Fed. Appx. 34 (6th Cir. 2004).

II.  Applying the Law to the Facts and Circumstances of Petitioner's Case

The Commissioner has promulgated a review process that IRS employees should follow when determining whether a spouse qualifies for equitable relief under section 6015(f).  Rev. Proc. 2003-61, 2003-2 C.B. 296, modifying and superseding Rev. Proc. 2000-15, 2000-1 C.B. 447.[2]  This Court employs those factors when reviewing the Commissioner's denials.  Washington v. Commissioner, supra at 147-152.

A.  Rev. Proc. 2003-61, Sec. 4.01--Threshold Criteria for Granting Relief

The review process begins with seven threshold criteria that a taxpayer must satisfy before the Commissioner will consider equitable relief.  Rev. Proc. 2003-61, sec. 4.01, 2003-2 C.B. at

_____

[2] The later revenue procedure applies to requests for relief, such as this one, that taxpayers file on or after Nov. 1, 2003, or those pending on Nov. 1, 2003, for which no preliminary determination letter has been issued as of that date.  Rev. Proc. 2003-61, sec. 7, 2003-2 C.B. 296, 299.

297.  The Court will not address the criteria for 1992 and 1995 because the Court agrees with respondent's determination that petitioner has met the threshold requirements on the portion of the liability that is attributable to her deceased husband.

The Court agrees further that on the basis of the attribution factor of Rev. Proc. 2003-61, sec. 4.01(7), respondent will not consider relief for 1999 because at the threshold, nearly all or all of the unpaid balance is attributable to petitioner.  We reach the same conclusion for 1998.  We note for completeness the importance of the attribution criterion.  One of the changes that the Commissioner made in revising the revenue procedure from 2000 to 2003 was to move up the attribution factor from being one of many considerations to being a threshold factor.  Compare Rev. Proc. 2003-61, sec. 3.01, 2003-2 C.B. at 297 with Rev. Proc. 2000-15, sec. 4.03, 2000-1 C.B. at 449.  Accordingly, petitioner's request for relief from joint and several liability for 1998 and 1999 is not appropriate because the liability is her own.

B.  Rev. Proc. 2003-61, Sec. 4.02--Circumstances Under Which the IRS Will Ordinarily Grant Relief

Where a requesting spouse has satisfied the threshold requirements of Rev. Proc. 2003-61, sec. 4.01, the Commissioner will ordinarily grant equitable relief under section 6015(f) if the requesting spouse's circumstances satisfy all three elements of Rev. Proc. 2003-61, sec. 4.02, 2003-2 C.B. at 298: (1) Marital

status, (2) knowledge or reason to know, and (3) economic hardship.

Petitioner satisfies the first element because Mr. Martinez's death in April 2001 was before her application for relief in August 2005. Regarding the second and third elements, knowledge or reason to know and hardship, Rev. Proc. 2003-61, sec. 4.03, 2003-2 C.B. at 298, incorporates those two elements as part of its analysis. Because petitioner does not satisfy at least one of the tests, to reduce redundancy we reserve our discussion of the two elements until the section immediately below.

C. <u>Rev. Proc. 2003-61, Sec. 4.03--Factors for Determining Whether To Grant Equitable Relief</u>

For requesting spouses who fail to qualify under Rev. Proc. 2003-61, sec. 4.02, the revenue procedure provides a list of nonexclusive factors that the Commissioner will consider to determine whether to grant full or partial equitable relief under section 6015(f). Rev. Proc. 2003-61, sec. 4.03, 2003-2 C.B. at 298. The revenue procedure provides further that no single factor is determinative, and the reviewer shall weigh all relevant factors, regardless of whether Rev. Proc. 2003-61, sec. 4.03, lists the factor.

### 1. Marital Status

Mr. Martinez died in April 2001, before petitioner requested relief in August 2005. Thus, this factor favors relief.

### 2. Economic Hardship

The Commissioner determines economic hardship relying on rules that the Secretary promulgated in section 301.6343-1(b)(4), Proced. & Admin. Regs. Rev. Proc. 2003-61, sec. 4.03(2)(a)(ii) (referencing Rev. Proc.2003-61, sec. 402(1)(c)). The regulation defines economic hardship as the condition where a taxpayer is "unable to pay his or her reasonable basic living expenses". Sec. 301.6343-1(b)(4)(i), Proced. & Admin. Regs. In determining a reasonable amount for basic living expenses, the Commissioner shall consider information such as: (1) The taxpayer's age, employment status, history, and ability to earn; (2) the amount reasonably necessary for living expenses such as food, clothing, housing, medical expenses, insurances, tax payments, and child support; (3) the cost of living in the geographic area in which the taxpayer resides; and (4) any extraordinary circumstances such as a medical catastrophe. Sec. 301.6343-1(b)(4)(ii), Proced. & Admin Regs. The requesting spouse bears the burden of proving economic hardship. Monsour v. Commissioner, T.C. Memo. 2004-190.

In determining that petitioner would not suffer economic hardship from denial of relief, the Appeals officer properly

relied on the Form 12510 that petitioner filed with her August 2005 request for relief, where petitioner self-reported monthly income of $2,636 and expenses of $2,480 which included a provision of $775 per month to pay the back taxes, for a monthly surplus of $156 in her basic living expenses. Petitioner subsequently corroborated respondent's determination by: (1) Stating that the main reason she stopped making installment payments in November 2005 was that the IRS stopped sending her payment coupons, not that she was suffering from financial need, and (2) recommencing the payments in 2006 and paying the IRS $775 per month from February through May 2006.

Normally our analysis of the economic hardship factor would end at this point with an affirmation of the Appeals officer's determination. However, section 6015(f) requires that we take into account "all the facts and circumstances". At trial in October 2007 more than 2 years after petitioner submitted the original Form 12510 in August 2005, petitioner provided a new Form 12510 that showed monthly income of $2,448 and expenses of $2,770, for a monthly deficit of $322. The expenses do not include a provision for payment of back taxes or for housing. Petitioner did not explain why her net income decreased by $188 per month, and respondent challenged the accuracy of the expense amounts that petitioner reported.

We are not required to accept a taxpayer's self-serving and unsubstantiated statements at trial. Tokarski v. Commissioner, 87 T.C. 74, 77 (1986). However, we do find credible that petitioner, whose lifestyle was already modest, did suffer a diminution in her financial circumstances. We note that she received no assets as a result of the death of Mr. Martinez, she incurred expenses to relocate to Southern California, she lives in an expensive State in a home that she does not own, and she drives and pays for an automobile that is also not her own. The car that she does own is 16 years old. She emptied her after-tax and retirement savings to provide for her children and to care for her dying husband. Her new husband has modest income and pays court-ordered child support.

Further, petitioner is now in her mid-fifties, has 13 years of education, works as a secretary, and earns in the mid-thirty thousands from a company that is downsizing and requires a long, expensive commute. Her combination of age, education, and work situation suggests limited earnings prospects. Moreover, if petitioner had to pay for housing or buy a new car, or if the couple suffered a significant financial or medical setback, then they or petitioner would be hard pressed to pay for their basic living expenses.

On similar grounds in Washington v. Commissioner, 120 T.C. at 150, we disagreed with the Commissioner and found that the

requesting spouse would suffer economic hardship if we did not grant her relief. Although the taxpayer was supporting two children and earned less than petitioner here, the requesting spouse's financial circumstances were similar in that she received no assets from the marriage, did not own a house, did not take vacations, and did not own the automobile she drove, and the IRS liens harmed her credit rating and limited her ability to borrow. Id.

We will not go as far here as we did in Washington to disagree with respondent because petitioner no longer has dependent children, her income is higher than that of the taxpayer in Washington, and petitioner did not substantiate her expenses. However, even without precise numbers detailing the family's or petitioner's current financial condition, we find that petitioner is in a precarious financial circumstance: Living paycheck to paycheck, maintaining a low standard of living, and having no significant savings or other financial cushion. For the foregoing reasons, we find the economic hardship factor is neutral.

### 3. Knowledge or Reason To Know

Respondent contends that petitioner fails this test because she knew or had reason to know at the time she signed the returns that Mr. Martinez would not pay the 1992 and 1995 tax liabilities. In a case such as this where the couple accurately

reported but did not pay the balances due, the relevant standard is whether the taxpayer requesting relief did not know and had no reason to know that her spouse would not pay the income tax liability. Rev. Proc. 2003-61, sec. 4.03(2)(a)(iii)(A); see Washington v. Commissioner, supra at 150-151; see also Feldman v. Commissioner, T.C. Memo. 2003-201, affd. 152 Fed. Appx. 622 (9th Cir. 2005). As is pertinent here, in making a determination whether the requesting spouse had reason to know of the nonpayment, the IRS will consider the requesting spouse's level of education, any deceit or evasiveness of the nonrequesting spouse, the requesting spouse's involvement in household financial matters, and any lavish or unusual expenditures compared with past spending levels. Rev. Proc. 2003-61, sec. 4.03(2)(a)(iii)(C); see also Price v. Commissioner, 887 F.2d 959, 965 (9th Cir. 1989) (specifying the factors).

To establish that she had no reason to know, the alleged innocent spouse must establish that: (1) When she signed the return, she had no knowledge or reason to know that her spouse would not pay the tax reported on the return; and (2) it was reasonable for her to believe that the nonrequesting spouse would pay the tax shown as due. Collier v. Commissioner, T.C. Memo. 2002-144.

In making his determination to deny relief to petitioner, respondent noted that: (1) The family's sole checking account

was in petitioner's name; (2) the IRS collected a 1988 tax debt in 1994 through a levy; and (3) after engaging a law firm to prepare the returns, petitioner signed the 1992 and 1995 returns in October 1998 with the returns showing balances due. Petitioner on the other hand argues that Mr. Martinez handled the family's finances and that he was not forthcoming with her. For example, he did not tell her he had quit his job, he did not seek reimbursement for medical expenses, and he hid from her correspondence from the IRS. She said that she thought the checking account had sufficient funds and that he would pay the balances due. She added that she believes diabetes contributed to his mental state.

Because we find that petitioner is a smart and responsible person, and given her situation, we find that her lack of knowledge is improbable. We believe that sometime after Mr. Martinez became ill in 1985, she assumed sufficient responsibility over their delinquent tax filings so as to encourage seeking help from a law firm, which they did in 1996. We find that Mr. Martinez lack of a separate or joint bank account suggests a certain degree of evasiveness on his part, and his deteriorating medical condition probably required her greater involvement in the household finances. In this regard, the awareness petitioner gained from the 1994 tax levy is significant. If simple compliance was the only objective, an

ordinary tax preparation firm would have sufficed.  We suspect that they specifically sought a law firm because petitioner knew that they had unfiled returns and unpaid balances from 1992 to 1995, and she wanted legal advice on how best to resolve the situation.

Even if we were to assume that petitioner was unaware until October 1998, by the time she or they sat down in the law firm's conference room and the attorney presented them with up to five delinquent returns (1992 to 1997) with four showing a balance due (1996 showed a refund), we find it is likely that petitioner and Mr. Martinez had had several conversations discussing how they would pay the balances due that then aggregated to several thousands of dollars.  Moreover, even if the above speculation is wrong and petitioner was still unaware, we find that it strains credibility to believe that, at the time petitioner signed the 1992 and 1995 returns on October 30, 1998, she did not know that the returns would not include payment checks.  The checking account was solely in her name.  Given all the opportunities that petitioner had to discover the problem, if she was still unaware, then we would have to apply our consistent holding that Congress designed the provisions for relief from joint and several liability "'to protect the innocent, not the intentionally ignorant'".  Morello v. Commissioner, T.C. Memo. 2004-181 (quoting Dickey v. Commissioner, T.C. Memo. 1985-478).

One last comment on petitioner's knowledge.  The main reason for the balances due for 1992 to 2000 was that petitioner had her employer withhold too little tax from her paycheck.  To cause this result petitioner must have claimed too many withholding allowances at work.  We speculate that petitioner maintained this situation year after year because it helped pay her family's daily living expenses, especially after Mr. Martinez stopped working.  Significantly, only petitioner, and not Mr. Martinez, could have filed the withholding certificate with her employer.

For all the foregoing reasons, we find that petitioner knew or had reason to know that she and Mr. Martinez would not pay the balances due when they filed the 1992 and 1995 tax returns.  In summary, this test strongly disfavors relief.

Regarding the significance of this factor, the prior revenue procedure stated that the knowledge factor was "an extremely strong factor" in determining whether to grant relief.  Rev. Proc. 2000-15, sec. 4.03(2)(b), 2000-1 at 449.  However, in promulgating the new revenue procedure the Commissioner explicitly downgraded the factor's significance to one of the many criteria where "No single factor [is] determinative of whether to grant equitable relief in any particular case."  Rev. Proc. 2003-61, secs. 3.03, 4.03, 2003-2 C.B. 297-298.  Even under the former, stronger weighting, we have granted relief where we found that "'the factors in favor of equitable relief are

unusually strong, it may be appropriate to grant relief under section 6015(f) in limited situations where the requesting spouse knew or had reason to know that the liability would not be paid'". Washington v. Commissioner, 120 T.C. at 151.

### 4. Legal Obligation

This factor comes into effect only when "the nonrequesting spouse has a legal obligation to pay the outstanding income tax liability pursuant to a divorce decree or agreement." Rev. Proc. 2003-61, sec. 4.03(2)(iv). This factor is inapplicable because the Martinezes did not divorce.

### 5. Significant Benefit

In Washington v. Commissioner, supra at 151-152, we held that the requesting spouse did not significantly benefit from the unpaid taxes because during and after the marriage she did not receive expensive jewelry, drive a luxurious car, wear designer clothes, take expensive vacations, own a home, receive assets from the marriage, or own the automobile that she drove.

Petitioner suffered from a similar lack of benefits. During and after the marriage she did not receive jewelry, luxury cars, or designer clothes. She did not receive and does not own a home, and does not own the car she drives. Further, she drained her savings and retirement assets trying to support her family and help her dying husband, and she incurred costs in moving to

Southern California after his death.  We hold this factor significantly favors relief.

### 6.  Compliance With Federal Tax Laws

With respect to compliance with Federal tax laws, the Martinezes filed their 1988 return on time, but respondent stated they filed their 1999 return "a few months late" (in September 2000 with no information on extensions).  However, since Mr. Martinez's death, the Appeals officer noted that petitioner has been in compliance.  This factor is neutral or in favor of relief.

### 7.  Abuse

Because we find that petitioner was not abused, this factor is neutral.

### 8.  Mental or Physical Health

We believe petitioner was under great mental strain dealing with her long-suffering and dying husband while supporting her family solely on her modest wages.  This factor strongly favors relief.

### 9.  Other Factors

Rev. Proc. 2003-61, sec. 4.03(2), states that the Commissioner will "consider and weigh all relevant factors, regardless of whether the factor is listed in this section 4.03." We find four additional factors merit consideration.

First, with respect to the 1995 tax return, on the basis of the requirement of section 72(t)(1), petitioner's attorney included a 10-percent additional tax of $2,181 because of the Martinezes' premature retirement plan distributions totaling $21,809. Mr. Martinez's withdrawal of $18,840 accounted for $1,884 of the additional tax. The record does not indicate that petitioner, her attorney, or respondent considered section 72(t)(2)(A)(iii), which provides an exception to the additional tax if the distribution was attributable to the employee's being disabled within the meaning of section 72(m)(7). Section 72(m)(7) provides that "an individual shall be considered to be disabled if he is unable to engage in any substantial gainful activity by reason of any medically determined physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration." See sec. 1.72-17(f)(1), Income Tax Regs.; see also Dwyer v. Commissioner, 106 T.C. 337, 340 (1996). Because Mr. Martinez stopped working permanently in 1995 and because his illness was progressively degenerative and ultimately resulted in his death, he was a good candidate for section 72(t)(2)(A)(iii) relief. Consequently, if one were to reduce the original 1995 balance due by $1,884 to remove the 10-percent additional tax attributable to Mr. Martinez and remove the related accumulation of interest and the other additions to tax (for late filing and late payment), the result would be that

respondent's application of petitioner's payments would have paid the entire remaining liability for 1995.

Likewise, we consider the possibility that in the years after Mr. Martinez stopped working in 1995 and until his death in 2001 the couple might have been able to reduce their balances due by itemizing their deductions instead of claiming the standard deduction. We observe that because Mr. Martinez likely had high medical expenses as a result of his illness, and the couple's income was low because petitioner's earnings were their only income, they might have qualified for a medical expense deduction. We do not know whether they owned a home for which they paid mortgage interest and property taxes. Our point in analyzing the possible itemized deductions and the exception to the 10-percent additional tax is that we need to consider that the liabilities may have been higher than necessary; i.e., that there was doubt as to liability.

The second supplemental consideration is petitioner's installment payments. Petitioner has paid $35,650 or 73 percent of the entire liability for 1992 through 2000, which includes a portion that was attributable to her deceased husband. We suspect that in 2001, when petitioner first proposed an offer-in-compromise for $1,000, respondent would have accepted an offer-in-compromise or other collection alternative that would yield 73 cents on the dollar, especially considering Mr. Martinez's then-

recent death in April 2001.  Additionally, by paying 73 percent petitioner has already paid an amount that in one analytical sense, reimburses the Treasury in full for the unpaid taxes and the interest.  In other words, from one viewpoint, the Government has received back its entire principal and the time value of money for all years 1992-2000.  This factor is not dispositive, but it indicates petitioner's good faith effort to resolve the problem.

We noted earlier that respondent's application of payments seems haphazard.  Because petitioner's payments under the installment agreement were voluntary, she had the right to direct the application as she chose.  See Muntwyler v. United States, 703 F.2d 1030, 1032 (7th Cir. 1983).  However, because petitioner did not instruct the IRS where to apply her payments, the option is moot now because "'In the absence of a designation, it is well settled that the IRS enjoys the right to apply payments in the manner it chooses.'"  Isley v. United States, 272 Fed. Appx. 640, 641 (9th Cir. 2008) (quoting United States v. Plummer 174 Bankr. 284, 286 (Bankr. C.D. Cal. 1992)).

Nonetheless, in reexamining the table supra page 5, we note that even accepting respondent's application as given, petitioner has paid more than her share of the liabilities for 1992 and 1995.  Further, if one were to double petitioner's share as an approximation to incorporate additions to tax and accrued

interest, the table still would show that petitioner is within $153 of fully paying the doubled amount for 1992 and has overpaid for 1995.[3]

The third additional factor is that the 1992 and 1995 liabilities are old, particularly the 1992 liability, where the IRS has strangely applied less of the payments. We would be remiss in an equity situation not to point out that the debt has already aged 16 years and is imposed on a widow and petitioner has made a good faith effort to repay the obligation.

Fourth, a review of the conference report accompanying the enactment of section 6015 shows that the conferees agreed to include the provision in the House bill "expanding the circumstances in which innocent spouse relief is available" and that Congress enacted section 6015 as part of the broader Title III, "Taxpayer Protection and Rights". H. Conf. Rept. 105-599, at 238, 249 (1998), 1998-3 C.B. 747, 992, 1005. Thus, to the extent the legislative history is significant here, we find that the history favors an expansive interpretation of relief.

For the foregoing reasons, the other factors strongly favor relief.

---

[3] For 1992 petitioner's share of the balance due was $1,680. Multiplying that by 2 as an approximation for additions and interest yields $3,360, minus her payments applied of $3,207, results in a shortfall of $153.

D.  Summary of the Factors

To aid the reader we summarize below the results of the above analysis:

1.  Marital status--favors relief.
2.  Economic hardship--neutral.
3.  Knowledge or reason to know--strongly disfavors relief.
4.  Legal obligation--inapplicable or neutral.
5.  Significant benefit--significantly favors relief.
6.  Compliance with Federal tax laws--neutral or favors relief.
7.  Abuse--neutral
8.  Mental health--strongly favors relief
9.  Other factors--strongly favor relief.

Accordingly, one factor strongly disfavor relief, three or four are neutral, and four or five favor or strongly favor relief.  "No single factor [is] determinative of whether to grant equitable relief in any particular case."  Rev. Proc. 2003-61, sec. 4.03.

This case is admittedly a close call.  In favor of denying relief, more than half of the couple's unpaid balances in 1992 and 1995 were attributable to petitioner's underwithholdings.  Also, after experiencing the 1994 levy petitioner knew, or had reason to know there was a problem at the time of engaging a law firm in 1996, or she knew or had reason to know that Mr. Martinez was not going to pay the balances due for the 1992 and 1995 returns at the time she signed the returns on October 30, 1998.  The checking account was in her name.  Further, petitioner has not met her burden of proving that a denial of relief will cause her to suffer economic hardship.

In favor of granting relief, we are particularly compelled by the following factors. Petitioner remained loyal to Mr. Martinez throughout his illness, and after discovering the tax problem she promptly engaged a law firm to resolve the matter. Petitioner has made an enormous effort through her installment payments to satisfy the debt. From one point of view, the amount that respondent has applied to 1992 and 1995 is already sufficient for petitioner to have paid her share of the debt for 1992 and 1995, or alternatively, petitioner has already paid an amount in total that is sufficient to pay all of the principal and interest from 1992 to 2000, including the amounts attributable to Mr. Martinez. Moreover, petitioner accomplished these payments on modest income. The underlying tax liabilities may have been overstated because of the medical exception to the 10-percent additional tax on premature retirement distributions, and perhaps because of the couple's failure to itemize their deductions. Though she did not prove economic hardship, petitioner's financial situation is clearly not strong. She lives in expensive California, and at least since 1992 she has lived only a modest lifestyle. She exhausted her savings and her retirement assets caring for her children and Mr. Martinez, and she has left herself in a precarious financial position. The 1992 debt is 16 years old and is imposed on a widow who in good faith has done her best to meet her tax obligations.

Balancing the equities, on the basis of the foregoing analysis we hold that for 1992 and 1995 the factors in favor of relief outweigh the factors disfavoring relief, with no single factor being determinative. We deny relief for years 1998 and 1999 because petitioner's request for relief failed at the threshold test of attribution.

### Conclusion

We end by noting petitioner and her situation are highly sympathetic and credible. Because we grant relief for 1992 and 1995 and deny relief for 1998 and 1999, petitioner will still owe respondent around $12,000 for debts from long ago.[4] If petitioner is truly suffering from economic hardship, or is unable to pay the debt, then she may want to approach the IRS with a request for relief under a different principle, such as an offer-in-compromise or other collection alternative, where the parties can further explore petitioner's ability to pay on the basis of her new financial situation.

To reflect our disposition of the issues,

An appropriate decision will be entered.

---

[4] By the time the parties receive this opinion, the $10,847 (= $4,882 + $5,965) aggregate balance for 1998 and 1999 as of April 17, 2007, will have grown with interest to a figure around $12,000.